**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**FACTORY ASSOCIATES &**
**EXPORTERS, INC.**
                                    **Plaintiff,**

-against-                                                           05-CV-837


**LEHIGH SAFETY SHOE CO. LLC**,

                                    **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

**I.     INTRODUCTION**

Plaintiff Factory Associates & Exporters, Inc. ("Plaintiff" or "Factory Associates") commenced this action originally asserting claims sounding in breach of contract (First and Fourth Causes of Action), fraudulent misrepresentation (Second and Fifth Causes of Action), and unjust enrichment (Third and Sixth Causes of Action). See Compl., dkt. # 1. Defendant Lehigh Safety Shoe Co. LLC ("Defendant" or "Lehigh") answered and asserted counterclaims sounding in failure to pay on an account stated (First Counterclaim), breach of contract (Second Counterclaim), and unjust enrichment (Third Counterclaim). See Ans. & Counterclaim, dkt. # 18.  By Decision and Order dated June 26, 2007, the Court granted Defendants' motion for summary judgment by dismissing all claims asserted in the original Complaint and Amended Complaint, except for the claim premised upon a breach of the implied warranty of fitness for a particular purpose.  This matter proceeded to a two day

1

bench trial before the Court that began on November 26, 2007 and ended on November 27, 2007. The parties were afforded until January 25, 2008 to submit post trial briefs. The following constitutes the Court's findings of fact and conclusions of law.

## II.     FINDINGS OF FACT

Plaintiff was a safety shoe distributor for Defendant. Plaintiff purchased the shoes from Defendant and resold them through Plaintiff's Nigerian agent and distributor, Jkpeez Impex Limited Co. ("Jkpeez"). Jkpeez primarily sold the shoes to Shell Petroleum Development Company ("Shell") in Nigeria.

Prior to 2002, Plaintiff had purchased Defendant's model 1628 and 1636 safety shoes. The model 1628 and 1636 shoes were well-received in Nigeria. In late 2000, Defendant advised Plaintiff that the model 1628 and 1636 shoes were being replaced by models 5628 and 5636 respectively. Thus, by 2002, large quantities of models 1628 and 1636 were no longer available. The model 1628 and 1636 shoes were manufactured in the United States, whereas the models 5628 and 5636 were manufactured in China. Defendant represented to Plaintiff and Shell that the new models were fit for use as safety shoes in Nigeria. See Pl.'s Exs. 7, 8 (letters from Defendant to Shell in Nigeria stating "we recommend this shoe as meeting all your requirements."); Pl.'s Ex. 13 (letter from Defendant to Plaintiff stating that "Lehigh's style # 5628 does meet and exceed the specification criteria outlined in this bid.").

As of 2002, Jkpeez had a "blanket" contract with Shell for the sale of safety shoes. Under this contract, Jkpeez was required to have a certain quantity of shoes available for Shell to purchase. Shell expressed a concern that Jkpeez did not have a sufficient quantity of safety shoes in stock. Tr. at 76. Shell wanted more shoes to be available in

2

Jkpeez's warehouse. Id.

In early 2002, Plaintiff's principal, Frank D'Abramo, approached Defendant's sales representative, Greg Andrake, to discuss a proposal for increasing the quantities of safety shoes available in Jkpeez's warehouse in Nigeria. During these discussions, it was expressed that Jkpeez needed to increase its inventory to respond quickly to customer (i.e. Shell's) demands. The parties to the meeting expected orders of approximately 5,000 pairs of shoes ever three to four months, resulting in annual sales of 15-20,000 pairs of shoes. Tr. at 272. It was Defendant's understanding that there would a turnover of shoes maintained in Jkpeez's warehouse every four to five months. Tr. at 78, 128, 130, 132, 273, 276, 281; Def. Ex. 8 (referencing a "4 month lead time").

In early 2002, Plaintiff placed an order with Defendant for a total of 8,214 shoes (comprised of both model 5628 and 5636 shoes) at a price of $45 per pair.[1] See Pl.'s Exs. 22, 24. It was understood that approximately one-thousand pairs of shoes from this order would be used to fulfill existing orders and the remaining one-half would be used for inventory in the Jkpeez warehouse. Tr. at 73, 76, 267-68. There was no forecast of how long these shoes would remain in inventory, id. at 73-74, 126, but, as noted, the parties anticipated inventory turnover roughly three times per year. Tr. at 78, 128, 130, 132, 273, 276, 281; Def. Ex. 8. The shoes ordered under the January 2002 contract arrived in Nigeria in June 2002. Plaintiff paid Defendant for the shoes at the price of $39.75 per pair;

---

[1] It is undisputed that the original price was $47.31 per pair, but by the time of shipping the price had been negotiated down to $45.00 per pair.

not $45.00.[2]  Tr. at 103.

At some point in 2002, it was learned that the blanket contract with Shell was ending.  Tr. at 40.  Shell was, therefore, re-bidding on safety shoes.  Id.  Because of the increased competition in the safety shoe market, by letter dated July 23, 2002, Defendant agreed to lower the price of its shoes to $39.75 per pair "beginning with the new award from Shell."[3]  Pl.'s Ex. 72.  Defendant also agreed that, "[a]t such time as the [Shell] contract is awarded. . . [w]e will allow a 50% credit of the difference in price between the price billed ($45.00) and the new contract price ($39.50), which is $2.75 per pair."  Def. Ex. 14.  Through this June 2, 2003 letter, Defendant was offering to retroactively reduce the price of the shoes ordered in January 2002 by $2.75 per pair once the new Shell contract was awarded.  See Tr. at 319.  Shell did not purchase any additional shoes and Shell did not award Jkpeez another contract for safety shoes.  Because Shell had not awarded a new contract to Jkpeez, in June 2003, Defendant sent Plaintiff a letter demanding payment in the amount of $43,123.36. Def. Ex. 14.

In October or November 2003, Plaintiff learned of complaints concerning the soles of the shoes.  Specifically, the soles were peeling off and crumbling.  In or about early 2004, Plaintiff contacted Defendant about the problem with the shoes.  At Defendant's request, Plaintiff provided Defendant with samples of the claimed defective shoes.  The

---

[2] This price differential is the basis of Defendant's counterclaim.  Defendant contends that Plaintiff is liable to it for the difference in price between the $39.75 per pair paid by Plaintiff and the $45.00 per pair contract price.  Plaintiff contends that Defendant further agreed to reduce the price of the shoes to $39.75 per pair.

[3] Plaintiff contends that Defendant agreed to apply the $39.75 price retroactively to the January 2002 order.

4

samples were provided to Defendant in May 2004.

By letter dated June 18, 2004, Andrake sent a letter stating that Defendant was unable to determine the cause for any defect.  Defendant also asked for additional sample shoes.  By letter dated September 22, 2004, Defendant wrote to Plaintiff stating that it was unsure what caused the decomposition to the soles of the shoes.  The September 22 letter also stated that "something has changed in the composition or properties of the outsole because of the manner in which the shoes were stored and/or the length of time stored. . . . The factory advises that polyurethane outsoles subjected to non-use and/or storage in a hot, moist environment for a long period may decompose over time.  This appears to be the base in the samples that were submitted, i.e., the shoes are over two (2) years old. . . . [T]he factory has advised that there is no basis for a claim against them." Pl.'s Ex. 35. Through this letter, Defendant further advised Plaintiff that the shoes were outside the one year warranty period. Id.

Plaintiff then commenced this action seeking to recover for what it claims are defective shoes.  Plaintiff asserts that the polyester polyurethane soles used in the new model shoes deteriorated from hydrolytic attack (otherwise know as hydrolysis or moisture attack), which is purportedly a known condition within the footwear industry whereby polyurethane material degrades when exposed to heat and humidity (such as is found in Nigeria).  Plaintiff further contends that Defendant knew or should have known that: (1) hydrolytic attack begins at time of manufacture and can cause a polyester polyurethane sole to decompose within weeks or months depending on actual temperature and relative humidity, (2) the shoes sold to Plaintiff were intended to be stored for more than a year in warehouses in Nigeria, and (3) the climate in Nigeria is hot and humid.

5

As noted, all of Plaintiff's claims were dismissed on summary judgment, except for its claim under the warranty of fitness for a particular purpose. Defendant asserted a counterclaim in the amount of $43,123.36 contending that Plaintiff paid only $39.75 per pair of shoes ($326,506.50), but that the contingency that would have lowered the price of the shoes from $45 to $39.75 per pair (i.e. Shell's additional order of shoes) never occurred. Thus, Defendant contends that Plaintiff owes $43,123.36 for the shoes based upon the agreed-upon price of $45 per pair.

## III.   CONCLUSIONS OF LAW

### A.   Warranty of Fitness for a Particular Purpose

New York Uniform Commercial Code § 2-315 governs the implied warranty of fitness for a particular purpose. Section 2-315 provides, in relevant part: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." N.Y. U.C.C. § 2-315. To establish a claim for the breach of an implied warranty of fitness for a particular purpose, "the buyer must establish that the seller had reason to know, at the time of contracting, the buyer's particular purpose for which the goods are required and that the buyer was justifiably relying upon the seller's skill and judgment to select and furnish suitable goods, and that the buyer did in fact rely on that skill." Saratoga Spa & Bath v. Beeche Sys. Corp., 656 N.Y.S.2d 787, 790 (3rd Dept. 1997). Thus, "[u]nder a theory of breach of implied warranty of merchantability or breach of implied warranty of fitness for a particular purpose, the inquiry is focused on consumer

6

expectations when the product 'was being used for the purpose and in the manner intended.'" Henry v. Rehab Plus Inc., 404 F. Supp.2d 435, 443 (E.D.N.Y 2005) (quoting Beneway v. Superwinch, Inc., 216 F. Supp.2d 24, 30 (N.D.N.Y. 2002)).

Here, the primary question is whether Defendant had reason to know, at the time of contracting, that Plaintiff intended to store the shoes for well over a year in its Nigerian warehouse. Based upon the evidence adduced at trial, the Court finds that Defendant unquestionably knew that its shoes were being sold to Plaintiff for storage in Jkpeez's warehouse in Nigeria pending sale to Shell and/or other of Jkpeez's customers. What is missing, however, is sufficient evidence upon which the Court can conclude by a preponderance of the evidence that Defendant knew that the shoes would sit in Jkpeez's warehouse for more than one year (during which time the soles might deteriorate).

The credible evidence before the Court demonstrate that, prior to 2002, Plaintiff placed frequent orders with Defendant. This suggests that Jkpeez was not stockpiling shoes in its warehouse and Defendant did not have reason to believe otherwise. With respect to the order at issue in this case, the credible evidence demonstrates that Shell was concerned that Jkpeez did not have sufficient inventory to fulfill its shipping needs. Accordingly, the parties worked out an arrangement to increase Jkpeez's inventory and reduce the usual six month lead time in acquiring safety shoes. As set forth *supra*, this was accomplished through a plan to rotate inventory approximately three times per year (every four months or so). The parties expected total annual sales of 15,000 to 20,000 pairs of shoes. The parties anticipated that these annual sales would be satisfied through approximately quarterly orders and shipments of quantities of 5,000 pairs of shoes. Based on the foregoing, there is insufficient evidence suggesting that Defendant knew, or had

reason to know, that Plaintiff planned to store shoes in Nigeria for more than one year at a time. To the contrary, Defendant had reason to believe that the Nigerian stock would be largely depleted every four months or so. Accordingly, the Court finds that Plaintiff failed to demonstrate by a preponderance of the evidence that Defendant had reason to know, at the time of contracting, that Plaintiff intended to store the shoes for well over a year in its Nigerian warehouse.

### B.     Defendant's Counterclaim

Defendant counterclaims in the amount of $43,123.36. The undisputed evidence before the Court is that, although the original contracted amount for the 8,214 shoes was $47.31 per pair, the parties agreed to reduce this price to $45.00 per pair. The evidence further demonstrates that the parties agreed to reduce the price for **future** shipments of shoes to $39.75 per pair **provided** Jkpeez was awarded a new contract with Shell. Tr. at 83-84, 139-41; Def. Ex. 14. Defendant further agreed to credit Plaintiff $2.75 per pair for the 8,214 pairs of shoes **provided** Jkpeez was awarded a new contract with Shell. Def. Ex. 14. Jkpeez was not awarded a new contract with Shell. Because Jkpeez was not awarded a new contract with Shell, neither of these contingencies came to fruition. It, therefore, follows that Plaintiff remained obligated to pay $45.00 per pair on the order of 8,214 pairs of shoes. Defendant is, therefore, entitled to judgment in the amount of $43,123.36, which amount represents the difference between the $39.75 per pair paid by Plaintiff and the $45.00 per pair owed.

## IV.     CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendant on Plaintiff's claim

on the warranty of fitness for a particular purpose and finds in favor of Defendant on its counterclaim in the amount of $43,123.36.  The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED**

DATED:February 1, 2008

Thomas J. McAvoy
Senior, U.S. District Judge